### CAPRON PECK *vs.* DANIEL B. CLAFLIN.

Several persons associated themselves as proprietors of a building to be erected and "used exclusively for an academy and similar purposes," and appointed trustees with power to lease the building. The building was erected on land conveyed to the trustees, to hold in trust for the proprietors "while they maintain a building thereon for the purposes of education," and was first used as an academy, but afterwards leased by the trustees to a district school under an oral lease and subsequently under a written lease for ninety-nine years. *Held*, that the grantees' estate was not terminated by the leasing of the building to the district school.

TORT for breaking and entering the plaintiff's close in Attleborough. At the trial in the superior court, before *Pitman, J.,* without a jury, these facts appeared:

On August 17, 1841, several persons associated themselves un-
der the name of "Proprietors of Academy Hall," and signed a
constitution or articles of agreement, the first article being: "The
building shall be used exclusively for an academy and similar pur-
poses, subject to the control of the proprietors;" and the second
article providing that "the proprietors may rent, lease, sell or use
said building as may best promote the object specified in article
first." The seventh article provided for the appointment of a
board of trustees, "with power to make such provision as may be
necessary to keep the building in good order for an academy, with
power to rent, lease or use the building according to the wishes
of the proprietors, and also to make such arrangements with the
teacher or teachers as may best promote the object of this asso-
ciation."

In 1842 a building called the Academy or Academy Hall was
built by the association on the close in question, by license of Na-
thaniel W. Sanford, who then owned it, and who on May 27,
1843, conveyed the premises to Jonathan Crane and eight others,
"trustees of Attleborough High School, or their successors in said
office, to hold in trust for the proprietors of said High School
while they maintain a building thereon for the purposes of edu-
cation," "to have and to hold the aforegranted premises, to the
said trustees or their successors in said office, to their use and be-
hoof forever," and covenanted that the premises were free from
incumbrances and that he conveyed the same to Crane and the
eight others, "or their successors in office, to hold in trust for the
benefit of the proprietors of said High School, while they occupy
the same for the purpose of education, and no longer." The per-
sons named as trustees in this deed were the same who were
chosen as the board of trustees under the seventh article of the
constitution.

An academy school was carried on in the building until 1864,
when, the academy not being sustained, the school district No. 18
in Attleborough occupied the building from time to time, for a
common school, as tenants at will at an annual rent. In 1867 the
board of trustees executed to said district (of which the defend-
ant was the prudential committee) a lease of the premises for

ninety-nine years, containing a condition that the premises should be used for the purposes of education; and at the time of the alleged trespass a school was kept in the building by and for the said district. In 1866 the heirs of Sanford conveyed the premises to the plaintiff. Some of the grantees named in the deed from Sanford are still living.

In 1868 the plaintiff sowed turnips on part of the premises, and the defendant pulled them up.

On these facts the judge ruled that the plaintiff could not maintain his action, and found for the defendant. The plaintiff alleged exceptions.

*E. Ames,* for the plaintiff.

*E. H. Bennett,* for the defendant.

CHAPMAN, C. J. The decision of this case depends upon the construction to be given to the deed of Sanford to Crane and others. After naming the grantees and calling them Trustees of Attleborough High School, it grants the land " unto the said trustees of the Attleborough High School, or their successors in said office, to hold in trust for the proprietors of said High School, while they maintain a building thereon for the purposes of education."

The reference to the proprietors is explained by extrinsic evidence. The deed is dated May 27, 1843. On August 17, 1841, several persons had associated together to erect a building, and signed a written agreement which they denominated a constitution. The first and second articles are as follows :

" Article 1. The building shall be used exclusively for an academy and similar purposes, subject to the control of the proprietors.

· " Article 2. The proprietors may rent, lease, sell or use said building as may best promote the object specified in article first."

By the seventh article, a board of trustees was to be chosen, with power to keep the building in good order for an academy, to rent, lease or use the building according to the wishes of the proprietors, and also to make such arrangements with the teacher or teachers as may best promote the object of this association.

Both the constitution and the deed were evidently prepared without consulting any one acquainted with the law of real estate.

A building called the Academy was erected on the land in controversy in 1842, by license from Sanford, the proprietor.

The evident intention of the proprietors at the time was, that the building should be occupied for such a school as is usually called an academy. Yet they did not restrict themselves to the maintenance of such a school in these articles of agreement cited above. And when Sanford came to make his deed, he restricted them only to the maintenance of the building for the purposes of education. This would embrace such a school as is called a district school. And it did not require the trustees to retain the control or superintendence of the school, or restrict them from renting it to others who should maintain a school as lessees.

Upon the facts stated in the bill of exceptions, it appears that a school, such as is required by the terms of the deed, has been maintained and is still maintained in the building, and that the title of the grantees has not terminated.

As the grantees, or at least a part of them, are still living, the question whether they took an estate in fee for the purposes of the trust does not arise. *Exceptions overruled.*